### CITY OF DALLAS et al. v. DALLAS TELEPHONE CO.

(Circuit Court of Appeals, Fifth Circuit. April 29, 1921.)

No. 3654.

1. Courts ⬤⟳101—Application to enjoin municipal board from maintaining confiscatory rates need not be heard by three judges.

An application for a preliminary injunction in a suit to enjoin a municipal board, authorized by the city charter and a city ordinance to regulate telephone rates, from maintaining or prescribing rates so low as to be confiscatory, in violation of Const. Amend. 14, is not one which, under Judicial Code, § 266 (Comp. St. § 1243), must be heard before three judges, of which one is a Supreme Court Justice or Circuit Court Judge; no attack being made on the constitutionality of any statute.

2. Constitutional law ⬤⟳129—Telegraphs and telephones ⬤⟳33(1)—Ordinance held not contract to charge confiscatory rates.

An ordinance authorizing the merger of two telephone companies, and reserving to the city full power and authority to investigate and regulate tariff rates under the charter and regulatory powers of the city, did not reserve to the city the right to maintain, by refusal to change, a confiscatory rate, or create a contract on the part of the telephone company to charge the rates fixed by the city, if confiscatory.

3. Telegraphs and telephones ⬤⟳33(1)—Schedule of rates, not disapproved, held effective.

Under an ordinance permitting the merger of two telephone companies, limiting telephone rates chargeable prior to October 1, 1920, and

providing for regulation thereafter by the city, and for the filing of proposed rates with the city secretary, to become effective in 30 days, if approved by the board of commissioners, or not acted on, unless the board extended the time for acting thereon for a period not exceeding 90 additional days, a schedule of rates to take effect October 1, 1920, filed in May, 1920, became effective on October 1, where the board did not act thereon within the 90 days' extension of time for their consideration.

**4. Injunction ⊂⊃158—Power to fix rates held not affected by injunction.**

A preliminary injunction, enjoining the enforcement of telephone rates because confiscatory, pending the determination of just and reasonable rates, does not prevent the city from exercising its charter power to prescribe just and reasonable rates.

Appeal from the District Court of the United States for the Northern District of Texas; James C. Wilson, Judge.

Suit by the Dallas Telephone Company against the City of Dallas and others. From an order granting a temporary injunction, defendants appeal. Affirmed.

James J. Collins, W. T. Henry, and W. S. Bramlett, all of Dallas, Tex., for appellants.

Joseph D. Frank, D. A. Frank, Wm. H. Duls, and Henry C. Coke, all of Dallas, Tex., and Claude Nowlin, of Oklahoma City, Okl., for appellee.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. The Dallas Telephone Company is a corporation of the state of Texas, formed by the consolidation of two telephone plants owned by two telephone companies in operation in the city of Dallas, Tex. Said merger was consented to, and the right and franchise to acquire, maintain, and operate the consolidated system and its extensions granted, and its future regulation provided for, by an ordinance of the city of Dallas which provided that all rights granted and held thereunder were subject to and governed by the charter of said city.

The existing telephone companies were merged into the Dallas Telephone Company in accordance with the terms of said ordinance. The pertinent provisions of said charter are as follows:

"7. The right is hereby delegated to the city of Dallas, acting through its board of commissioners, to determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy a franchise, or exercising any other public privilege, in said city, and to prescribe the kind of service to be furnished by such person, firm or corporation, and the manner in which it shall be rendered, and from time to time alter or change such rules, regulations and compensation. The board shall make rules and regulations granting a fair hearing to persons or corporations to be affected by said regulations, and no change in regulations shall be adopted except after notice to the persons affected and after a fair hearing shall be granted them. * * *

"8. * * * Provided, however, that any such public service corporation may from time to time, with the consent and approval of the board of commissioners, adopt schedules governing rates, conditions or quantities of service considered and allow applicants to choose between alternative schedules, but no such schedule shall be operative, nor shall service be furnished in

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

accordance therewith, until filed and approved by the board of commissioners of the city of Dallas.

"227. The city of Dallas shall have the power, by ordinance, * * * to regulate and fix the fares, tolls and charges of local telephones and exchanges, * * * and generally to fix and regulate the rates, tolls or charges, and the kind of service of all public utilities of every kind."

Said ordinance provided that the rates for telephones should not exceed per month $5 for business and $2 for residence telephones for the period ending October 1, 1920, but that on the conclusion of said period the city should forthwith determine the rates which the telephone company might thereafter charge. One of the provisions of said ordinance was as follows:

"To the end that the rates for telephone service in the city of Dallas shall always be reasonable, the city shall have at all times the full power and authority to investigate, fix and regulate such rates under its charter and the regulatory powers of the city and by virtue hereof. The city shall have full authority to investigate and shall consider the quality and value of the service, the fair value of the property, its revenues and expenses, and shall determine and allow a fair return upon property value, and give proper consideration to every fact which in its judgment has, or may have, a bearing upon the matter of reasonable rates. In order to ascertain any and all facts, the board shall have full power and authority to inspect, or cause to be inspected, the books of grantees, and to inventory and appraise, or cause to be inventoried or appraised, the property of grantees and to compel the attendance of witnesses, and the production of books and records, and to prescribe the penalties for the failure or refusal of grantees to testify, or to produce books and records from time to time, as required."

The telephone company might from time to time propose changes in their rates, no higher rates to become effective until after October 1, 1920. The method of making such proposals was provided by said ordinance.

On May 19, 1920, said Dallas Telephone Company filed with the city of Dallas its application for increased telephone rates as per schedule attached, the same to become effective October 1, 1920. Said application was made in accordance with section 9 of said ordinance, which provided that changes of rates proposed by the telephone company should be filed with the city secretary for consideration of the board of commissioners and left on file for 30 days. If within that period the same have been approved, or have not been acted upon, by the board in whole or in part, the whole, or the part which is approved or is not acted upon, shall take effect as proposed: Provided, however, that said board shall have the right by resolution duly passed within said 30-day period to extend its time for acting upon such changes in rates for a period of not exceeding 90 additional days, in which event the board shall give to the telephone company a hearing with reference to the proposed changes in rates. After the hearing provided for is had, the board, before the expiration of such 90 days, shall either approve the proposed changes or make such order as may be reasonable, disapproving the said changes or either requiring grantees to make no changes or fixing and prescribing what change or changes grantees should make and what rates they shall charge—

"and the proposed change or changes in rates in so far as same are contrary to such order of said board shall not take effect unless such order be thereafter rescinded or modified by the board or be held by a court of competent jurisdiction to be unreasonable or confiscatory in whole or in part of grantees' property or rights."

On June 24th the city by resolution of its board of commissioners directed the telephone company to be notified that they deemed it necessary to demand the largest period of time in the consideration of such matter, to wit, at least 90 days. On June 28th the board fixed July 1st for giving a hearing to the telephone company upon said application and said hearing was then entered upon.

On September 23d the city of Dallas, through a letter from its mayor, notified the telephone company that the board of commissioners would allow an increase in rates based on a charge of $7.50 per month for business telephones and $3 per month for residence telephones (the schedule of rates which had been filed proposed a schedule based on $10 a month for business telephones and $4 a month for residence telephones), but no emergency clause would be attached to any order granting an increase in rates, and any increase granted should be effective for a period of only one year. Under the city charter, unless an emergency clause is attached thereto, no order takes effect until 30 days after its passage. No ordinance was adopted or official action taken fixing the above rates, or any other, and the city insists that the above letter was not written officially, but was intended merely as a suggestion.

A bill was filed by the telephone company upon September 27th seeking to enjoin the city from interfering with its putting into effect its schedule of rates filed with said city on and after October 1st. The court dismissed said bill as prematurely brought. The board of commissioners, shortly after the dismissal of said bill, on October 13, 1920, passed a resolution calling upon the telephone company to appear before the board of commissioners on October 20, 1920, to give testimony touching said rates desired by said telephone company, the hearing to continue from day to day until the same was finally concluded by the order of the board. The officers appeared and such hearing was begun. It was continued from time to time until October 26th, when a further resolution of said board was passed, purporting to extend the time for investigation in accordance with the terms of said franchise ordinance for an additional period, to expire on January 1, 1921, unless the subject-matter of said proposed changes should be determined earlier by said board.

On October 29th this bill was filed, alleging the matters hereinbefore set forth and that the said city by its action is insisting that the rates of $5 a month for business telephones and $2 a month for residence telephones are the existing rates and will so remain until a change thereof is authorized by an order of the city of Dallas; that complainant's revenues under such rates are less than its actual operating expenses by $3,000 a month, and that it cannot continue a regular telephone service in the city of Dallas unless the rates in the schedule as filed are permitted; that the same are the lowest rates which protect

it from actual loss and confiscation; that it has a lawful right to charge said rates as filed, because the said city has failed to exercise its regulatory powers in respect thereto; that a failure to authorize such rates, and an insistence upon the enforcement of present rates of $5 and $2 a month for business and residence telephones, respectively, is confiscatory, and deprives complainant of its property without due process of law, and is a taking of its property for public uses without due compensation. It avers that, unless the said city is enjoined from insisting upon the existing schedule complainant will be exposed to attempts to forfeit its franchises, upon putting into effect its proposed rates; that it will not be able to collect its necessary rates and charges from its patrons; that not only a suit or suits will be filed against it for the forfeiture of its franchise rights, but many suits for damages for failure to render service at such confiscatory and inadequate rates, and also suits to compel it to render service at such rates, and a multiplicity of actions and suits will result; that unless a preliminary injunction is granted it will lose much revenue which it can never collect, whereas, a preliminary injunction can be granted on condition that complainant will give bond to protect every patron and subscriber against any loss whatsoever, if such rate should be finally held to be illegal.

Complainant prayed that said existing rates of $5 a month and $2 a month be declared unconstitutional and void and that the said city and its officers be temporarily restrained and permanently enjoined from enforcing the same; also that they be temporarily restrained and permanently enjoined from interfering with the collection of the schedule as proposed by plaintiff and filed with the board of commissioners; that the city and its officers be temporarily and permanently enjoined from in any manner interfering with the plaintiff in charging and collecting for local telephone service, in said city, rates and charges sufficient to pay the reasonable and necessary expenses of operating its property and a fair and reasonable return upon the fair valuation thereof, and for general relief.

The city answered said bill, moving therein that the bill be dismissed as being without equity, in that the telephone company was without power initially to fix or prescribe rates and charges to be imposed upon and collected from the public for its public service, but that such power and authority under the ordinance of the city rested wholly with the city government and authorities; also that under the franchise ordinance the telephone company had entered into a binding contract with the city for the manner of fixing rates and charges, and that thereunder a change of said rates could only be made by the city in accordance with said ordinance; that the city was pursuing the terms of said contract, and the suit of the telephone company was an effort to override and repudiate the same. The city averred that it was proceeding in good faith and in accordance with said ordinance to inquire into and fix as speedily as practicable a proper schedule of rates, and it had not concluded its hearing thereon. It also attacked a part of the items claimed to constitute the operating expenses of the plaintiff, and alleged that the proposed rates were too high.

The matter was heard upon an application for a preliminary injunction before the District Judge upon bill and answer and proofs submitted. The court found on the facts that the rates named in said ordinance at the time when it took effect barely produced sufficient revenue to meet the operating expenses of the telephone company, and the revenue steadily fell short each succeeding month; that during the two years from October 1, 1918, the company had received approximately $1,000,000 less than it cost to operate its system; that the money loss from January to October, 1920, ranged from $60,000 to $80,000 less than it was costing the company to operate, leaving out every item of expense questioned by the city, and, reducing the aggregate expenses of operation by these amounts, the revenues received by the company were not sufficient to pay even its actual operating expenses; that the franchise ordinance provided that the company should receive after October 1, 1920, such a rate as would produce a reasonable return upon a fair valuation of its property, in addition to its operating expenses, and that this is also provided by the Constitution of the United States; and that complainant's property is being taken for public use without due compensation, and without due process of the law, unless it is allowed a reasonable and adequate compensation; that the city had not been reasonably diligent in the matter of acting under the franchise ordinance in forthwith determining the rates which grantees might charge after October 1, 1920—and enjoined the city from interfering with the schedule of rates proposed by plaintiff. The court expressly held that it was not deciding what was a fair or reasonable rate, but only that the present monthly rates of $5 and $2 for business and residence telephones, respectively, were confiscatory, and that irreparable loss and injury were being suffered by the telephone company, and the city of Dallas had refused or failed to comply with the obligations of the franchise ordinance to determine the rates which the company should charge. The court required complainant to give a bond in the sum of $400,000, with good security, conditioned to pay back to the city and each one of its subscribers the pro rata share of any difference in charge in the event that, as a result of this proceeding, a lower rate than $10 and $4, respectively, was adjudged to be reasonable.

After the opinion in said case was announced, and before the entry of the decree, defendants moved to suspend the entry thereof upon the ground that the cause is one in which an injunction is sought suspending and restraining the enforcement, operation, or execution of a statute of the state of Texas, by restraining the exercise of authority by an administrative board, acting under and in pursuance of the statutes of such state, upon the ground of the unconstitutionality of such statute, and that such cause should be heard as provided by Judicial Code of the United States, § 266 (Comp. St. § 1243), by three judges, of whom at least one should be a Justice of the Supreme Court or a Circuit Judge, which motion was overruled. The overruling of said motion and the granting of said temporary injunction are the errors assigned here.

[1] 1. In this case no attack is made upon the constitutionality of any statute of the state, but the attack is made upon the effect of an action of a municipal board in insisting upon a maintenance of certain rates, to be charged by a local company for local telephone service, upon the ground that the action of such municipal board amounts to prescribing rates so low as to be confiscatory and as such in violation of the Fourteenth Amendment of the Constitution of the United States. The federal courts have held that section 266 of the Judicial Code of the United States does not apply to a bill seeking an injunction to restrain the enforcement of a municipal ordinance as violating the Fourteenth Amendment of the federal Constitution. Sperry & Hutchinson Co. v. City of Tacoma (C. C.) 190 Fed. 682; Cumberland Telephone & Telegraph Co. v. City of Memphis (D. C.) 198 Fed. 955; Birmingham Waterworks Co. v. City of Birmingham (D. C.) 211 Fed. 497. We think that the District Judge had jurisdiction to entertain and decide this motion for a preliminary injunction.

[2] 2. The city of Dallas contends that, by the terms of its charter and of the ordinance consenting to the merger of the two existing telephone systems and permitting the consolidation to maintain its telephone lines on the streets of said city, the Dallas Telephone Company was bound to furnish telephone service at such rates as should be prescribed by the city, and that until the city permitted a different rate, the telephone company could only charge rates on the basis of $5 per month for a single-line business telephone and $2 per month for a single-line residence telephone.

The telephone company insists that under said ordinance the city was bound after October 1, 1920, to forthwith determine (i. e., fix) rates which the telephone company might charge, which rates, after paying expenses of operation, would allow a fair return upon the property value, considering all relevant facts; that the city, by failing to forthwith determine what rates said telephone company should be allowed to charge after October 1, 1920, and insisting that the existing rates of $5 and $2 per month for business and house telephones, respectively, must continue to be charged, until it had fixed other rates, was prescribing said rates for such service after October 1, 1920, and requiring the furnishing thereof at such rates; that, as these rates were not sufficient to pay the cost of operation, without any allowance for a return on the value of the property so used, this amounted to a taking of the property of the telephone company for public use without due compensation, in violation of its rights under the Fourteenth Amendment of the Constitution of the United States.

Said ordinance contained two general provisions regarding the rates to be charged—one which stipulated that prior to October 1, 1920, no greater rate should be charged than $5 per month for business telephones and $2 per month for residence telephones, and the provisions of section 9 of the ordinance, reserving "the full power and authority to investigate, fix, and regulate such rates under its charter and the regulatory powers of the city and by virtue hereof." As to the period ending October 1, 1920, it is conceded that such rates were maintained

during that entire period, notwithstanding it is insisted that they were insufficient.

As to the right of regulation reserved to the city for the subsequent time, we do not think that this constituted a contract with the telephone company that it could not charge thereafter other rates without the city's consent, if the existing rates were confiscatory. This, we think, is settled by the recent decision of the United States Supreme Court in the case of City of San Antonio v. San Antonio Public Service Co., 255 U. S. ——, 41 Sup. Ct. 428, 65 L. Ed. ——, where the property of four public service corporations furnishing gas, electricity, and street car service were permitted to be acquired by the San Antonio Public Service Company under an ordinance of that city. By an ordinance of 1899 extending their franchise to occupy its streets to July 1, 1940, the city provided as to the street car companies that they "shall charge five cents fare for one continuous ride over any one of their lines with one transfer to or from either line to the other." We quote from the decision:

"The city consented by an ordinance which expressly subjected the public service company to all the limitations, duties, and obligations which rested upon the traction company and the gas and electric company. The ordinance further provided that: 'In accepting the provisions of this ordinance the San Antonio Public Service Company agrees that the city shall hereafter have the right to pass all ordinances not in direct conflict with the laws of this state fixing and regulating the rates, prices and terms at which gas and electricity shall be furnished for public and private purposes to the city and its inhabitants.' * * * The ordinance having been accepted by the public service company, the consolidation was accomplished.

"At and for a long time prior to the consolidation the penal code of the city contained a provision, accompanied by a penalty for its violation, forbidding, except during certain hours of the night, the charging of more than a five cents car fare within the city limits. Shortly after the approval of the consolidation, another ordinance was passed, forbidding and penalizing any person, firm, or corporation, enjoying franchises within the city limits, or their agents or employees, from charging more than the rate then charged and collected, without obtaining the permission of the city. In conformity with this last-mentioned ordinance the public service company, in August, 1918, applied to the city for permission to increase its rate of fare from five to six cents, based upon the ground that, although the five-cent fare was remunerative at the time it was fixed, it had, by the increase in cost of operation in practically every department, become wholly insufficient for that purpose and could not be continued without confiscating the property of the company. After a hearing the city, by an ordinance reciting that as the company was bound by the 40-year franchise granted in 1899 to charge five cents fare, the city did not feel authorized nor called upon to set it aside, and furthermore that the hearing had shown no necessity for the change in rate asked, refused the company's request, at the same time prohibiting, under a penalty which was stated, any person, firm, or corporation operating any street railway within or partly within the city from charging more than a five-cent fare. Thereupon the company commenced this suit by filing its bill to enjoin the city from enforcing the five-cent fare ordinance. * * * The city moved to dismiss the bill for want of jurisdiction because it presented no substantial federal question, as it showed on its face that the parties were bound by the five-cent fare provision of the franchise ordinance as a contract subject to be enforced, even though the rate was confiscatory, and moreover because the bill otherwise stated no ground for equitable relief. The court overruled the motion."

The final decree enjoined the city from interfering with the complainant in substituting a seven-cent car fare for a five-cent fare, and from enforcing, various ordinances prohibiting and punishing the charging of a higher rate than five cents. The decree reserved the right to the city to ask relief whenever through a change of conditions the five-cent fare ceased to be confiscatory. Holding that the bill presented a substantial federal question, the Supreme Court said:

"That, in view of the admitted fact of confiscation, the court had power to deal with the subject, we are of opinion is too clear for anything but statement. And we think it is equally clear that, as the right to regulate gave no power whatever to violate the Constitution by enforcing a confiscatory rate, u result which could only be sustained as a consequence of the duty to pay such rate arising from the obligations of a contract, it follows that the solitary question to be considered is whether a contract existed empowering the city to enforce the confiscatory rate."

The court further ruled that the terms of the ordinance did not create a contract for a fixed rate which the city could enforce, but only reserved the right of the city to fix and regulate rates in subordination to the constitutional restriction on taking private property for public uses without due compensation. As to the respective duties of the owner of such property and the public authorities it said:

"The duty of an owner of private property used for the public service to charge only a reasonable rate, and thus respect the authority of government to regulate in the public interest, and of government to regulate by fixing such a reasonable rate as will safeguard the rights of private ownership, are interdependent and reciprocal."

Affirming the decree granting the injunction, the court concludes:

"The fact is that all the contentions of the city as implication of contract as to the 1899 rates but illustrate the plainly erroneous theory upon which the entire argument for the city proceeds; that is, that limitations by contract upon the power of government to regulate the rates to be charged by a public service corporation are to be implied for the purpose of sustaining the confiscation of private property. Home Telephone Co. v. Los Angeles, 211 U. S. 265, 273, 29 Sup. Ct. 50, 53 L. Ed. 176, and cases cited; Milwaukee Electric Railway Co. v. Wisconsin R. R. Commission, 238 U. S. 174, 180, 35 Sup. Ct. 820, 59 L. Ed. 1254."

The ordinance in the present case does not prescribe any rate to be charged after October 1, 1920, but is a reservation of the regulating power governed by the above respective duties of the telephone company and the city. It is quite clear that the reservation of the powers to regulate and fix rates does not confer the power to maintain, by refusal to change, a confiscatory rate, and that the ordinance does not create a contract on the part of the complainant to continue to charge such rates, if confiscatory. San Antonio Traction Co. v. Altgelt, 200 U. S. 304, 26 Sup. Ct. 261, 50 L. Ed. 491; City of San Antonio et al. v. San Antonio Public Service Co., 255 U. S. ——, 41 Sup. Ct. 428, 65 L. Ed. ——, decided April 11, 1921; Southern Iowa Electric Co. v. City of Chariton, 255 U. S. ——, 41 Sup. Ct. 400, 65 L. Ed. ——, decided April 11, 1921.

But if it be conceded that the ordinance prescribed the condition upon which the telephone company was permitted to maintain its lines on the streets of the city of Dallas, and that if the observance thereof

entailed loss on the company this would not relieve it from a compliance therewith (Columbus Ry. & Power Co. v. Columbus, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648), we do not think that the ordinance, properly construed, sustains the contention of the city. The period during which it is contracted, or made a condition, that rates per month shall not exceed $5 for business and $2 for residence telephones, expired with October 1, 1920. The provisions for the future fixing of rates did not create a contract in relation to future rates, but provided a reasonable method for the exercise by the city of its power of regulation, with a recognition that the rates should be fair and reasonable, and such as, after paying expenses of operation, would afford a fair return upon the value of the investment.

[3] Under the terms of this ordinance the court was warranted in granting a preliminary injunction. From its provisions as to the manner of making such rates it is quite evident that the rates named therein were to remain fixed only through October 1, 1920. That was the date named in the ordinance for a new adjustment of rates. Whether an application was made by the company for a change, or not, the ordinance provided:

"At the conclusion of said period expiring October 1, 1920, the city shall forthwith determine (upon the principles fixed in this franchise) the rates which grantees may thereafter charge."

But the ordinance gave to the grantees (now the telephone company), in anticipation of the arrival of such period, a right to have the rates which would be reasonable, and permitted, after October 1, 1920, ascertained in advance of said date.

"In connection with any adjustment of rates grantees, if ordered by the board, *or on their own initiative*, may make a showing to the board, on *or prior to the date any adjustment of rates is to be made*, of the facts which will enable the board to act advisedly." (Italics ours.)

The ordinance further provides a method by which the company may inaugurate proceedings for a change of rates:

"Grantees may *from time to time* propose changes in their rates, *but no higher rates shall become effective until after the expiration of the period ending October 1, 1920*." (Italics ours.)

Clearly this contemplates that such changes may be proposed prior to October 1, 1920. The provision that the company may, prior to the date any adjustment of rates is to be made, initiate a hearing by the board, and the permission to "propose changes from time to time," coupled with the provision that the changes proposed should not "become effective until after the expiration of the period ending October 1, 1920," compel the construction that such changes might be made in the manner prescribed, before the expiration of such period, to become effective upon its expiration.

Such proposed changes, after remaining on file with the city secretary for 30 days, if approved or not acted on, in whole or in part, by the board, shall, unless the time for consideration is extended by the board for an additional time not exceeding 90 days, in which event a hearing shall be had, become effective as to the whole or such part of

said changes approved or not acted on. Action by the board before the expiration of said 90 days' extension is required:

"The proposed change or changes in rates, *in so far as same are contrary* to such order of said board shall not take effect unless such order be rescinded or modified by the board or be held by a court of competent jurisdiction to be unreasonable or confiscatory in whole or in part of grantees' property or rights." (Italics ours.)

We construe this ordinance to provide that at any time, prior to, as well as after, October 1, 1920, the telephone company could propose changes of existing rates. Where made on or before October 1, 1920, the rates would not become effective until after October 1st. But an application for changes made, if no action at all was taken by the board in 30 days after it was duly filed, would become effective "as proposed," unless the period for consideration and action was extended for 90 additional days as provided. In this event action was to be taken within said 90 days, after which time the rates proposed "in so far as same are contrary to such order of said board shall not take effect." This language, coupled with the provision that the rates approved, or not acted on within 30 days, should take effect as proposed, would make effective on the expiration of such 90 days such changes as were not disapproved by order of the board as proposed in said schedule; i. e., after October 1, 1920, subject, of course, to the right of the board at all times to prescribe fair and reasonable telephone rates.

The telephone company, acting under this provision of this ordinance, in May, 1920, proposed a new schedule of rates to take effect at the expiration of the period ending October 1, 1920. The board by resolution on June 24, 1920, extended said time for consideration thereof for 90 days. This period expired on September 22, 1920. No action by said board was taken on said changes within said period or since, except a resolution adopted in October, 1920, extending said period for consideration of said proposed changes until January 1, 1921. The answer of the city, and the evidence, indicate the purpose of the city and its officials to insist that the schedule of rates in effect prior to October 1, 1920, continues in effect until a change therein is made by ordinance or resolution of said board, and to resist by all means in its and their power the charging or collecting meanwhile by said telephone company of any higher rates or charges.

We are of the opinion that the action of said city in the premises is in effect an effort to exert the power to prescribe telephone rates granted to it by its charter, to continue, and thus prescribe, the rates effective on October 1, 1920, for the time following the expiration of the period ending October 1, 1920; that by reason of the failure of the city to act on the schedule of rates proposed and filed in May, 1920, the telephone company had the right to charge said schedule of rates after said October 1, 1920. Detroit United Railway v. Detroit, 248 U. S. 429, 39 Sup. Ct. 151, 63 L. Ed. 341.

That the rates in effect prior to October 1, 1920, were unreasonably low, is not in dispute in said case. The court has not fixed the rates to be charged; it has enjoined the enforcement of rates adjudged to be unjust and unreasonable because confiscatory, and pendente lite enjoin-

ed the interference with complainant in its charging of a schedule of rates proposed by the complainant, pending the fixing of just and reasonable rates by the city of Dallas as provided in said ordinance. City of Toledo v. Toledo Rys. & Light Co., 259 Fed. 450, 458, 170 C. C. A. 426. The said city has the right to change said rates, if the same are not just and reasonable, by a schedule of just and reasonable rates, which will provide a fair return on the value of the property employed by the telephone company for public use.

[4] There is nothing in the order of the court which in any way prevents the city from continuing its investigation, and from exercising its power under its charter from time to time to prescribe just and reasonable telephone rates for telephone service in said city of Dallas.

The order of the court so construed, with its provision for a bond to be given by the telephone company on granting said preliminary injunction, was a proper exercise of judicial discretion, and is affirmed.